Please call the first case. 310-0046, Doug. Calling Temporary Services. Counsel, please. Have you got an opponent? I do. You've got to come up and sit. Please proceed. Thank you, Your Honors. May it please the Court. Counsel, my name is Peter Stokopoulos. I'm here on behalf of Kelly Services. The issues before the Court this morning are, in essence, whether a party can ignore stipulations and, if so, what weight should be assigned to the facts that were stipulated to. This case was tried twice under Section 19B. At the conclusion of the first 19B hearing, the arbitrator and then subsequently the commission, in essence, ordered the parties to agree upon a true independent doctor to look at the case and make decisions going forward. What was the import of that, from your perspective? The import of that, from my perspective, was that the arbitrator and the commission both thought that the doctors that were involved in the case, being Dr. Soriano, who performed the Section 12 exam, and Dr. DePhillips, who was the treating physician, probably were looking at this the wrong way, and the commission was concerned and wanted an independent doctor to look at the case and to make a decision as to what should be done from there forward. Well, that seems to be the problem. What is the scope of that appointment? Was it to assess or was it to bind? I think it was both. I think that the decision was made to enter into this agreement where the parties would agree on somebody who would then take a look at the facts of the case, take a look at the medical records, perform an evaluation, and come to an independent conclusion as to what needed to be done, and I think that if the parties were bound by that. Counsel, where in the record can you point us to that establishes the parties agreed to be bound by Dr. Goldberg's opinion? Where is that binding stipulation in the record? Where is there evidence that it was intended to be a binding stipulation as opposed to a referral? Neither party put in writing in the record that it would be binding. We were operating under that assumption. I was certainly operating under that assumption. Well, does an assumption take the place of a stipulation? I think in this case, given the way everything unfolded, this was a stipulation. We were ordered to do this by the Commission. Both sides agreed to do it. There was two pieces of correspondence sent to the doctor by both parties, and there was no two ways about it. I mean, if that had come back against me, I certainly would have been prohibited from going and getting another IME to come back around that agreed evaluation and try to come up with facts that were more persuasive to my point of view. Well, how is this different than a general situation? The record reveals Goldberg was chosen by the parties, pursuant to a recommendation, you're correct, by the arbitrator, to indicate to provide a true second opinion as to prospective treatment. So if he's being engaged to provide a second opinion, why would that in and of itself be binding on anyone? It would be binding because of the because of the fact that it was ordered by the Commission to make decisions about what was going forward and that the parties agreed that we would use this doctor. We didn't I mean, whether it's a recommendation by the Commission, I guess we didn't have to do it. I could have gotten an IME of my own, and he could have proceeded with the treating physician. So you're saying every time there's an agreement on a doctor, it becomes binding on the parties? Not every time. And you agreed to use the same doctor? I don't think that's true every time. I think in this case, when it's ordered by the Commission and when there is an evaluation and then a subsequent functional capacity evaluation and then the parties again approach that doctor in order to form his final opinions, I think that's a different situation than if there's a casual conversation in the hallway on the eighth floor of the house, and there's a run for it, and so on. So you're saying, in order to cut to the chase here, why don't we just have him seen by so and so, and we'll see what he says? Well, you alluded to an order by the Commission. Is that what happened here? Or did the arbitrator make a recommendation? The arbitrator made a recommendation which was not changed by the Commission. The arbitrator's recommendation was as part of the order. And in reading the order, the arbitrator says no part of this case in front of that same arbitrator. Did disappointment with Dr. Goldberg work out good as far as the claimant was concerned from his own personality? I'm sorry, I don't understand the question. Well, did Dr. Goldberg, did the claimant like Dr. Goldberg? That I don't know. He didn't really testify as to whether he liked him or not. He's not my client, so I didn't have the opportunity to talk to him about that. The record doesn't show anything about his appointment with Dr. Goldberg and what he thought about him? My memory is that he testified that the appointment was short. But I don't remember whether he said if he liked him or not. And if you look at the actual evaluation that was performed, it would be hard for Dr. Goldberg to do all those things in a short amount of time. But did he ask Dr. Goldberg for his opinion? I believe that he testified that he did. And what did Dr. Goldberg tell him? That I don't know. I haven't talked to Dr. Goldberg. I know that the claimant claimed that Dr. Goldberg said that he couldn't tell him what his opinion was. But looking at how this case unfolded, that could very well be because Dr. Goldberg needed more information. At the end of that first evaluation, he had informed his opinion. He said, you know what? This guy has signs of symptom magnification. My physical exam is normal. He has anatomic findings that don't make sense, including pain in the spine radiating up into his neck and then down into all four extremities. Given all those factors, I'm sure he didn't know what his opinion was at that time. Otherwise, he wouldn't have ordered an FCE and said, you know, I need to see this FCE and I'll render my final opinions. So in terms of what actually happened, I don't know. Dr. Goldberg was not my doctor. I didn't have the chance to talk to him. He wasn't opposed. There's no report with – there's no mention in his report as to what his version of what happened was when the claimant claimed that he asked for what Dr. Goldberg's opinions were. Counsel, do you have a fallback position in this case? That is to say, if we were to find, for example, that the opinion by Goldberg was not binding on the parties, where does that leave you in terms of the evidence in this case? That leaves me with a manifest weight argument, and I would argue that signing with Dr. DeFillips against Dr. Goldberg in this case would be against the manifest weight of the evidence. Is it just DeFillips and Goldberg, or is it DeFillips and Dr. Sweeney that you are arguing against? It's DeFillips and Dr. Sweeney who regularly provide second opinions for Dr. DeFillips, and I think he saw the claimant on one occasion and agreed with everything that Dr. DeFillips wanted to do. And if you look at, in terms of a fallback position, if you look at the manifest weight argument, we agreed to Dr. Goldberg, so both parties obviously respected his opinions. If not, I think that we probably wouldn't have agreed upon him. It doesn't mean you respected his opinions, you just agreed on him examining the claimant. Well, I think if my opponent, for example, had suggested somebody whose opinions I didn't respect, I would not have said, okay, I agree to send him there and I'll sign a letter not on letterhead with you and let's see what this doctor says, and I'm quite sure that my opponent would have felt the same way. Counsel, you know, I probably don't want to get hung up on the technical elements of a stipulation, but I'm sure you know a binding stipulation can't be, hey, what about this doctor? You say, yeah. Is that the functional equivalent of a binding stipulation? In that situation, I would say that. You seem to be saying it is. Well, I think in this case it's different because of what the only reason we had the evaluation was because the commission told us to. Is it your thesis that the commission concede its obligation to determine the credibility of medical testimony by appointing a doctor and saying we're going to do whatever this doctor says? That was the impression that I got. You think they can do that? There is a section in the Act where they can order an evaluation. Well, no question they can order it, they can consider it, but that's not the question I asked you. My question is, can they turn over their obligation to determine the credibility of medical testimony merely to the opinion of some doctor, say whatever he says that's what we're going to do? Can they do that in advance? I suppose they could do that. I don't know if they could do that in this case. I don't think they can do it. Well, aren't you arguing that they did that? I'm arguing that they... You're arguing that that's what should be done in this case.  I don't know if you're arguing I'm arguing that's what should be done in this case. I'm arguing that's what should be done in this case. I'm arguing that they should be asked to do so, that those opinions become stipulated facts. Commission can tell what parties what evidence they'll introduce to present to them? They regularly do. We have arbitrators that tell us when I have medical records that are this thick that they don't want to see all that and they want me to just take out... That's a little different. I didn't ask you that. I'm sorry? They can tell you what doctor your client has to be examined by and they won't listen to the testimony of another doctor? They can tell you that? Maybe not overtly, but there are certainly doctors where if I get an evaluation, I know that the commission will not listen to what that doctor says. Well, that's probably because the doctor doesn't tell the truth very often and they know that. But that's not the question I asked you. I asked you whether they can restrict who you will present as a witness. I didn't say they have to believe them. But can they restrict you until you have to? This case has to be decided by whatever Dr. Jones says? No, I don't know if they... That's your argument today. My argument is that they told us to do this. We followed what they told us to do and then we agreed to a doctor who would then say this is what's going to happen from here on out. And that that agreement was a stipulation by the parties to follow the doctor's opinions and do what that doctor said. I'm with Judge Hudson. Assume we reject that argument. What's your fallback? Why is it against the manifest way of the evidence? And don't tell me because they told you to go to Goldberg. No, no, no. No. I mean, if you look at, even if you look at my opponent's reply brief and just take a look at the outline, even in that, of how benign these findings are in this 19-year-old's back and that Dr. DeFillis wants to do a fusion, it's unreasonable to think that this young man does need a fusion. He's got some mild degenerative disc disease. He's got a bulging disc. There's a possibility of an annular tear which may come or go. And to think that you should perform a fusion on a 19-year-old man, I guess now he's probably 24 or so, is against the manifest way to the evidence given Dr. Goldberg's findings. You know, the symptom magnification, his reading of the MRI, the negative discograms that showed no concordant pain at the level it wants to be done. There's insufficient evidence to support a finding that this man requires surgery. Counsel, with regard to penalties and fees, the record appears that for several months prior to Dr. Goldberg's evaluation, all of the other medical opinions were unanimous in recommending surgical procedures to remedy the claimant's pain. So tell us why, succinctly, that the commission's decision to impose penalties and fees is against the manifest way to the evidence. In light of all these other medical opinions. Because of the opinions of Dr. Goldberg and the fact that the respondent was operating under the assumption or under the understanding that this was an agreed evaluation that was ordered by the commission, and the But for what purpose? It becomes key. Was his appointed task to render an opinion as to treatment or as to causation? Because if it was for treatment and not causation, it's only going to aggravate the situation. Well, you know, it's interesting. Because if you look at the letters that were sent to Dr. Goldberg, we asked him to evaluate the patient. We wanted it to try to be as benign as possible. And we didn't want to sway him in any way, shape, or form. The commission said for further treatment. And Dr. Goldberg gave us the opinions, his honest opinions, without any attempt to sway from either side. He just sent two letters that just said, here are the records. You're going to see them. Please let us know your opinions. Except the employer. Your client was arguing, was refusing to pay the TTD and medical expenses even after the first arbitration hearing and before receiving Dr. Goldberg's unsolicited causation opinion. Doesn't that seem just a little unreasonable? Well, what happened was the first case was still in the review process. And once the review process was over, my client paid the TTD that was awarded by the commission. In the meantime, it caught up to the evaluation that was going on with Dr. Goldberg. But up until that point, the only medical opinions were unanimous in favor of causation, were they not? Was there any opinion that was given that was not finding a causal connection? Well, and I guess I don't – I'll have to look again, but I don't – Counsel, you're not good looking. Sit down. Your time is up. You'll have time on rebuttal. Thank you, Your Honor. Counsel, please. May it please the Court. My name is Mark Wilson. I represent Dustin Cashmore in this matter, the Appellee and Cross-Appellant. It's our position that the decision awarding TTD benefits, medical bills, and the surgery is not against the manifest way of the evidence and should be affirmed. Can you answer that last question from your perspective? What the – what was the last question exactly? I'll let my colleague answer that question. Or repeat it. I think the – what I was getting at is I was asking him what opinion was the employer relying on when all of the opinions before Goldberg gave his unsolicited opinion found that there was a causal connection. Was there a contrary opinion as to causal connection at that point? There's no contrary opinion as to causal connection. We not only had Dr. Sweeney and Dr. DePhillips, but in the first decision, Dr. Cain, it's K-O-E-H, K-O-E-H-N, he gave a causal connection opinion in the first arbitration decision as well. So there's no contrary medical opinion. The employer continued to deny the TTD and the medical expenses even without supporting medical opinion in its favor of causation, correct? That's true. I'd answer this too. Was Goldberg retained to give an opinion as to treatment or as to causation? It was – my understanding was only with regard to treatment. And for the reasons that have been talked about here, it's our position that the decision awarding such benefits was not against the manifest way of the evidence and should be affirmed. Now, I also did a cross appeal with regard to the issue of penalties. And what I think is very important when considering the assessment of penalties and attorney fees is to look at the entire context of the case. And we have to remember that this case was – the original accident occurred on December 8 of 2003. We're talking about a 19-year-old individual. Was there a delay caused by the employer? Yes. What I was going to say, Your Honor, is that if we look to the first arbitration decision, I believe the arbitrator, Andros, was using restraint in not assessing penalties and attorney fees at that time. And at that time, they were relying on Dr. Soriano with regard to denying causal connection at that point. And I quoted within the arbitrator's decision – and remember, this is that first arbitration decision. Arbitrator Andros believed that Dr. Soriano's opinions were unreasonable, stating, quote, this testimony is so far off the mainstream of the findings of all the treaters and the radiologists not involved in this litigation, plus the consultation by Dr. Cain, that this arbitrator totally discounts Dr. Soriano's conclusion in this particular case and set of facts. So it's almost like arbitrator Andros was really using a lot of restraint in not issuing attorney fees and penalties at that time. And then he made this recommendation with regard to the independent doctor. Wait a minute. Didn't you agree? You agreed as to the independent doctor, didn't you? We – yeah, I mean, we – he made the recommendation that there be an independent doctor. What would you say? And we were agreeable to that, but we did not believe that Dr. Goldberg ended up being an independent doctor that we thought he was going to be, evidenced by, you know, all the things that we're talking about. Well, whether or not he ended up doesn't really answer the question. Was there some kind of a binding agreement stipulation between you and the other counsel in the parties that Goldberg's opinion would be binding upon the parties? Oh, no, absolutely not. I mean, it wasn't – it was an agreement that he would – that we'd follow the recommendation of the arbitrator, which was for him to go see the – Dr. Goldberg with regard to recommendations, but by no terms was there an agreement that whatever he said would control. Who picked Dr. Goldberg? Excuse me? Who picked Dr. Goldberg? Your Honors, to be honest, I – Scott Gannison was the attorney for my office that was more involved with that aspect of it. So did he pick him? No, I mean, I don't – I'm not aware of him picking him. I don't believe that's the case. I believe it may have been proposed by defense counsel and then – I don't – But, you know, I don't – I'm not absolutely certain on that point. But – Well, I take it then there was nothing in writing about this. This is just some verbal agreement between you and your firm and the other counsel. There was nothing in writing regarding the impact or import of Goldberg's proposed testimony. I would agree with that, Your Honor. Is that fair to say? That's fair to say. And what – it seems like when the arbitrator assessed the penalties, I mean, he was very – it was almost like in an emotional way. I believe that his frustration and a bit of anger is almost asserted within his decision there, as it was his belief that his recommendation that he made, even though he was probably cutting them a break and not awarding penalties in the first place, then they kind of violated his rule by not – or whatever you want to call his recommendation – by not truly having an independent position rule on this. Now, wait a minute. What are you arguing those last statements in support of? Of the fact that – You're saying that the emotionality of the arbitrator led to this decision. I'm saying that I think that there may have been a bit of emotion within his decision, but then the commission, when they looked at it, they said, well, you know, we believe that penalties should be assessed, but not for, you know, this notion of the improper conduct, but more by looking at the actual substantive evidence and said about how the fact that when benefits are terminated, you have to look at a doctor's opinion within the context of all the evidence, and they felt that it was unreasonable. So even though I think that that's what Arbitrator Andrews – there may have been a bit of emotional aspect to it, the commission said, well, you know, we're not following an emotional aspect of it. We're just looking at the facts, and we believe that penalties were appropriate here. And I believe that we really – those – the assessment of penalties and attorney fees should be reinstated. Otherwise, we could be here again on this matter. I mean, this thing should have been taken – Well, your argument is that it's unreasonable for them to have relied on that first doctor, and you can see that in the language used by the arbitrator. Yes. Right? Yes. And then you're saying that it's therefore also unreasonable. Goldberg's opinion wouldn't support that as well, right? Right. Well, we wouldn't reinstate it because otherwise we might be here again. That would not be a legitimate legal basis. We would reinstate it because the finding was against the manifest weight, or I should say the commission's finding was not against the manifest weight, correct? I mean, that's your position or not? That's my position. It has to be. Okay. That's my position, Your Honor. You don't want to get off on a tangent here. Right. Right. For these reasons, I ask that the decision to be affirmed with regard to the award of TPD benefits, medical bills, and the prospective surgery, and that the decision be reversed as to penalties and attorney fees. Thank you. Mr. Grigoro, please. I did take the opportunity to look at Dr. Goldberg's two reports, and I actually didn't see the causal connection opinion that you were referring to in his reports. I wanted to just double check. It was my memory that he just commented on his need for further treatment, whether he was a surgical candidate, and whether he could return to work. Well, that would make your position even worse then, wouldn't it? I don't know. Because then what contrary opinion do you have on the causal connection issue to overturn the penalties? Well, that he was able to work. I guess there's no causation opinion. Basically, Dr. Goldberg is saying there's nothing wrong with this guy. He's making it up. So I guess in that way there is kind of a causation opinion, because he's saying that it's all symptom magnification and it's not actually related to the accident because there's nothing wrong with him. But he doesn't say this man needs surgery, he has to be off work. However, it's not related to the work accident. Well, did anybody say that the claimant's condition of well-being on your side of the case was not related to the accident? Did anybody say that? I think that causation never really became a true issue, because even Dr. Soriano said that he's not a surgical candidate and there's nothing wrong with him. Going back to what opposing counsel said in that first arbitrator's decision, it seemingly implies that Soriano, or whatever his name is, is just so out to lunch that he arguably didn't provide a good basis for denying the benefits. So your argument is we didn't need to because it was still under review, that arbitration, that first arbitrator's decision? That first arbitrator's decision was still under review, and then once it was finalized we paid the benefits that were awarded under that decision. And Dr. Soriano, in that decision that you're referencing, the arbitrator said it wasn't unreasonable for the respondent to rely upon a board-certified neurosurgeon. And to say that Dr. Soriano was out to lunch and that his opinions didn't make sense, well, Dr. Goldberg, I think everybody in this town respects his opinions in terms of being honest. Unless it's before we get to Goldberg. It's before we get to Goldberg, but he actually agrees with everything that Soriano said from five years ago. So putting it in the full context of the case and all the doctors that have looked at this case, you know, Dr. Soriano doesn't look as crazy now as he did to the arbitrator when we tried it the first time because Dr. Goldberg has actually agreed that there's nothing wrong with this guy and he should be able to go back to work and that his symptoms don't make any sense. And with reference to who chose Dr. Goldberg, it was done with Mr. Gannison. He and I talked about it. I think he actually proposed Dr. Goldberg and I said I'm fine with Goldberg. And in terms of whether there was an, you know, these things are not in the record, I understand, but let me just say that counsel was not part of those conversations when talking about whether we would live and die with Dr. Goldberg. And I am quite sure that if Dr. Goldberg said this man needs surgery and cannot work, and then I went and got an IME that said he doesn't need surgery and he can work, that that evaluation ordered by the commission and agreed to by the parties would be held against me. Counsel, was there a reason then in the exercise of prudent judgment there was no written stipulation as to the binding nature of Goldberg's opinion? Wouldn't that have been the best thing to do? In retrospect, I should have done that. I put my trust in my opponent, and in retrospect, I won't. Prospectively, I would not do that. Lessons to be learned. Yeah. And, let's see, what else was mentioned? Oh, counsel has talked a lot about the arbitrator's decision in his briefs and here today, and as we know, you know, the arbitrator's decision is not before this Court under Markman and Masterly Binding. It's actually the commission decision that we're looking at. So arbitrator Andros' imagined conversations between the claim representative and Dr. Goldberg really don't come into play at all when it comes to assessing penalties or why any decision should be made. There's no evidence in the record that any improper contact was made between Dr. Goldberg and anybody. And I would ask that the circuit court decision overturning the penalties be affirmed and that the rest of the decision on the issue of Mr. Cashmere's ability to return to work and need for further medical treatment be overturned. Thank you. The Court will take the matter under advisement.